**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**RAYMOND N. ERVIN,**         )
                                        )
          **Plaintiff,**        )
                                        )    **No. 05 C 2294**
                                        )
          **v.**                )    **Mag. Judge Michael T. Mason**
                                        )
**JO ANNE B. BARNHART,**     )
**COMMISSIONER OF**           )
**SOCIAL SECURITY,**          )
                                        )
          **Defendant.**     )

### MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Raymond N. Ervin ("Claimant" or "Ervin"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Ervin's claim for Disability Insurance Benefits pursuant to the Social Security Act ("Act"), *42 U.S.C. §§ 416(i)* and *423*. This Court has jurisdiction to hear the matter pursuant to *42 U.S.C. § 405(g)*. For the reasons set forth below, Ervin's motion for summary judgment is granted and this case is remanded to the ALJ for further proceedings consistent with this opinion.

**PROCEDURAL HISTORY**

On February 15, 1995, Ervin filed an application for Disability Insurance Benefits ("DIB"). (R. 264). Claimant's application was originally denied on August 15, 1995. (R. 268). Ervin filed a timely request for reconsideration, which was subsequently denied on September 16, 1996. (R. 274, 276). He then requested a hearing, which was held on April 21, 1998 before ALJ Irving Stillerman. (R. 278, 46). ALJ Stillerman denied Ervin's

request for benefits in a written report issued on August 13, 1998.  (R. 481-87).

The Appeals Council subsequently granted Ervin's request for review on August 17, 2001, vacating ALJ Stillerman's decision and remanding Ervin's case to another ALJ. (R. 502).  The Appeals Council's order instructed the ALJ to consider the new evidence submitted by the claimant and obtain updated medical records from claimant's treating physicians and other medical sources.  (R. 503).  Subsequently, ALJ Robert Karmgard conducted two hearings on January 15, 2003 and February 12, 2003.  (R. 91, 204).  ALJ Karmgard denied Ervin's request for benefits on February 28, 2003 in a written decision. (R. 28-45).  The Appeals Council then denied Ervin's request for another review on January 7, 2005, and ALJ Karmgard's decision became the final decision of the Commissioner.  *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  Ervin now claims that the ALJ erred in finding him not disabled between December 3, 1993 and April 14, 2000.

**FACTUAL BACKGROUND**

**I.      Claimant's Testimony**

**A.      Biographical information**

Claimant testified at the hearings held on April 21, 1998, January 15, 2003, and February 12, 2003.  (R. 48, 97, 213).  According to his testimony, Ervin was born on October 10, 1955.  (R. 52).  He stands 5' 10" tall and generally weights between 250 to 270 pounds.  (R. 51, 112).  Ervin is right-handed and wears eye glasses.  (R. 52, 112, 214).  He has a bachelor's degree in chemical engineering.  (R. 54).

Ervin moved to Canada in late December 1993. (R. 111). From February 1996 through November 1998, claimant alternated his place of residence between Canada and the United States. *(Id).* At the April 21, 1998 hearing, claimant testified that he lived in Ontario with his wife and three children. (R. 50, 54). Claimant later testified that he permanently returned to the United States in November 1998. (R. 71). In August 1999, claimant divorced his prior wife and married his present wife. (R. 109). At the January 15, 2003 hearing, Ervin stated that he resides with his wife and six month old daughter, while his older children remain in Canada with his ex-wife. (R. 110). Erwin claims he was disabled and unable to work from December 3, 1993 through April 14, 2000 due to the combined effects of labile (fluctuating) blood pressure, various mental disorders, abdominal pain, and other physical ailments. (R. 104-05). He last met the disability insured status requirements on December 31, 1998, and therefore must establish "disability" on or prior to that date in order to qualify for benefits. (R. 29).

## B.    Relevant Employment

In December 1993, immediately prior to the onset of his alleged disability, claimant worked as a staff engineer for North American Contract Employee Services ("NACES"). (R. 61-62). Claimant testified that he left NACES on December 3, 1993 because he was experiencing severe abdominal spasms. (R. 67).

Ervin testified that all of his work prior to December 1993 involved chemical engineering. (R. 60-61). He received his bachelor's degree in chemical engineering and began working as a field project engineer in 1977. (R. 54, 222). For approximately the next fifteen years, claimant worked as a field project engineer, evaluating and installing

3

equipment for various companies. (R. 222). These jobs required claimant to be on his feet for 40 to 50 percent of the workday and lift up to 100 pounds when installing or inspecting equipment. (R. 123, 223-24). Claimant stated that, in addition to his private employment as a chemical engineer, he spent sixteen years in the Naval Reserves. (R. 61).

In 1995, claimant returned to work for approximately eight to ten months at University Scholarships in Canada, where he was responsible for establishing business models for distributing educational scholarship products. (R. 63, 120, 220). Claimant testified that he worked out of his home for approximately sixteen to twenty hours a week, that the position required no carrying or lifting, and he remained seated 80 to 100 percent of the workday. (R. 121, 150, 220-22). Ervin stated that he earned "absolutely nothing" at this position because "the business faltered." (R. 121, 220).

On February 26, 1996, claimant began working as a sales representative for ACS National. (R. 56). Ervin testified that his job was to "sell temporary employees" to engineering firms. (*Id.*) He added that this position was actually more stressful than working as a chemical engineer. (R. 75). Claimant continued working for ACS National until July 1, 1997, earning approximately $80,000 in 1996 and $60,000 in 1997. (R. 58, 115). According to claimant's testimony, his employment at ACS National involved very little lifting or carrying, and he spent about 70 percent of his time seated. (R. 116, 220). Ervin testified that his medical condition made working at ACS National difficult. (R. 146-47). In particular, claimant's abdominal spasms, in connection with his hypertension, caused him to retreat to the bathroom for a total of four hours out of the work day. (R. 75). Ervin testified that he left his position at ACS National because he was experiencing

4

severe abdominal cramping and syncope (fainting) episodes, and because Dr. Frederick Ettner recommended he discontinue work because the stress was contributing to his high blood pressure. (R. 58-60, 70, 117-18). ACS National placed claimant on short term disability from July 1997 through January 1998. (R. 119). While on short term disability, claimant received $600 each week. (R. 60).

Claimant testified that he did not return to work until 2000, when he was employed by the Census Bureau for about one month to conduct database management functions for the Lake County Census. (R. 215). According to Ervin, this job involved lifting and carrying boxes of documents weighing no more than twenty or thirty pounds, and about half of his workday was spent seated. (R. 215-16). Since September 2000, claimant has been self-employed as a patent agent. (R. 113, 214). This position does not require any significant lifting or carrying, and claimant remains seated approximately seventy percent of the workday. (R. 117, 214).

At the January 15, 2003 hearing, claimant reported that he received disability benefits from Monarch Life Insurance Company ("Monarch") through a personal policy in the amount of $5,900 per month from December 1993 to the present. (R. 78, 119).

### C.    Medical History

Claimant testified that his medical problems began around December 3, 1993. (R. 112). However, claimant also stated that he's "pretty certain" his abdominal spasm began in 1992. (R. 126). Claimant definitively stated that in December 1993 his abdominal spasms occurred two or three times a week and lasted approximately thirty minutes. (*Id.*) He further testified that these spasms "weren't at the same degree of

severity" as his later abdominal issues. (*Id.*) According to Ervin, by April 1996 his abdominal spasms "got worse." (R. 125). He claimed the abdominal spasms occurred two to four times a week, and lasted about fifteen minutes in duration. (*Id.*) By July 1997, the spasms had increased to four to six times a day, lasting thirty to forty minutes each. (R. 125, 128). Claimant testified that, in his opinion, the abdominal spasms were caused by his hypertension medication. (R. 125).

Claimant stated that the abdominal spasms continued even after he stopped working for ACS National in July 1997. (R. 76). During the April 21, 1998 hearing, Ervin claimed he was still experiencing severe abdominal pains and cramping that would result in syncope episodes. (R. 58-59). These episodes would occur up to three or four times a day. (R. 67). According to Ervin, he would begin feeling pain in the upper quadrant of his abdomen which would turn into sharp muscular pains radiating down to the lower quadrant. (R. 68, 134-35). The episodes would last anywhere from fifteen to forty-five minutes and were accompanied by difficulty breathing, intense sweating, and eventually unconsciousness for fifteen to thirty minutes at a time. (R. 68-69, 139). At that time, Ervin claimed that his blood pressure was labile. (*Id.*) He described his blood pressure as being normal for some periods of time and then elevating above normal levels by forty or fifty points for prolonged periods of time. (*Id.*)

Claimant later testified that around September 1999, he experienced episodes of severe abdominal pain and spasms, lasting thirty to forty-five minutes per incident, four to five times a week. (R. 43). By December 2000, claimant's abdominal episodes lessened, occurring only twice a week. (R. 133). Within a few months, they decreased to once per week to once every other week, and the duration and severity of the

6

episodes "was far, far less." (R. 132). Claimant further testified that the abdominal cramping episodes "usually tended to occur when there were changes in [his] hypertension medication" and that stress also "tended to set them off." (R. 118). He testified that these stressors included trying to meet deadlines and dealing with difficulties related to personnel management, client issues, and/or budgeting issues. (*Id.*) Claimant noted two visits to the emergency room, in 1996, due to his abdominal spasms. (R. 135-36).

Claimant testified that in 1993 he began experiencing fainting episodes approximately three times per week. (R. 137). He characterized the initial episodes as unrelated to the abdominal cramps (*id.*), and opined that they were from his "blood pressure and the headaches." (R. 126). Claimant stated that by 1996 the syncope episodes "became more frequent with the abdominal events." (R. 137). Claimant testified that by April 1996 he was passing out at least twice a day. (R. 138). The fainting episodes continued at the same rate until January 1997, at which time they began to decrease. (*Id.*) During 1998 and 1999, claimant passed out four to five times per week. (*Id.*) By April 2000, the syncope episodes occurred about once a week. (*Id.*)

Ervin also stated that he was treated by Dr. Wayne Quan, a psychiatrist, for his mental health problems, most notably depression and anxiety. (R. 76, 129, 141). Claimant stated that his depression began in 1996, manifesting in difficulties concentrating on and completing projects at work, sexual dysfunction, lethargy, poor motivation, and a disconnect from other people and society. (R. 141-42). Ervin testified that the depression made it difficult for him to go to work, interact with clients and manage personnel. (R. 77). Claimant stated that this work related stress, along with

budget issues, marital problems and child custody issues, contributed to his depression. (R. 129-30).

Claimant testified that his episodes of depression and anxiety continued from 1996 until April 2000, when his insomnia, lethargy, and problems with social interaction greatly improved. (R. 142-43). In April 2000, claimant was only taking Prinivil for his blood pressure and no medication for his depression and anxiety. (R. 145, 155). Claimant recalled that he last took medication (Anaprhil) for depression and anxiety in early 1998 and would experience hallucinations and other side effects. (R. 145). Claimant stated that his medication changed about every other month. (R. 154). While the medication provided temporary relief for his blood pressure, claimant testified that "the medication probably left [him] agitated or one thing or another." (*Id.*)

Claimant testified that he had insomnia from 1993 until December 2000. (R. 67, 124). He stated that he experienced liver abnormalities, and that a biopsy was recommended but not conducted. (R. 76, 139). Ervin testified that he started getting headaches in 1992. (R. 140). These headaches initially occurred once a week, and increased to two or three times a week in April 1994, after which time they subsided. (*Id.*) The headaches returned near the end of 1995, occurring a couple of times a day until about January 1996. (R. 141).

At the April 21, 1998 hearing, claimant testified that he was seeing Dr. Quan once a month, Dr. Ettner once a quarter, and Dr. Louis DiRaimo once a month. (R. 79-80). Claimant stated that he was seeing Dr. Ettner, an internist, for his abdominal spasms in 1993. (R. 69-70). Claimant testified that he began seeing Dr. DiRaimo in December 1993 and began seeing Dr. Quan in April 1994. (R. 72).

8

## II.    Medical Evidence

In his application for disability insurance benefits filed February 15, 1995, Ervin alleged an onset date of December 3, 1993.  (R. 264).  The application states that Ervin's disability was due to malignant hypertension, anxiety and stress, and related physical distress caused by the medication used to treat his high blood pressure.  (R. 284).

### A.    Dr. Frederick Ettner

Claimant saw Dr. Ettner from October 1991 to July 17, 2002.  (R. 330-33, 515-22, 755, 755-71, 804-08).  For the period following the alleged onset date of December 1993, Dr. Ettner's notes consistently indicate claimant suffered from hypertension (R. 330, 515-17, 522, 757, 763, 765, 769) and anxiety and depression.  (R. 515, 521, 765, 804).  Dr. Ettner's records also reference abdominal cramping and pains (R. 515, 520-21, 523-30), insomnia (R. 515, 804), biceps tears in both arms (R. 515-16, 758-59), porphyria (R. 515-16) and syncope.  (R. 330).

In 1993, claimant saw Dr. Ettner for treatment of his hypertension and syncope episodes.  (R. 330).  Dr. Ettner diagnosed high blood pressure and discussed decreasing claimant's work related stress.  (*Id.*)  He prescribed Maxzide and refilled claimant's prescription for Zestril.  (*Id.*)  In 1994, claimant saw Dr. Ettner for his hypertension and was instructed to continue taking Zestril.  (*Id.*)

In 1996, claimant visited Dr. Ettner five times and complained of biceps tears in both arms and worsened abdominal pain.  (R. 515-16).  On February 5, 1997, Dr. Ettner noted Ervin's blood pressure was 140/104 and recommended weight loss.  (R. 515).  Claimant also reported that he felt depressed since the increase in medication.  (*Id.*)  In

subsequent visits, Dr. Ettner twice questioned whether porphyria might be present and prescribed Quinine for claimant's abdominal pain. (R. 515-16). He also prescribed Hydrochlorothiazide ("HCTZ"), Prinivil, Norvasc, and Catapres for claimant's hypertension and L-tryptophan for his hypertension, anxiety, depression, and insomnia. (*Id.*)

In 1997, claimant saw Dr. Ettner six times. (R. 516-20). During these office visits, Dr. Ettner consistently noted that claimant showed signs of continuing hypertension and obesity, and Ervin reported abdominal pain and cramping. (*Id.*) Dr. Ettner continued to monitor Ervin's blood pressure and recommend changes to claimant's diet and exercise. (*Id.*) On July 1, 1997, claimant sought treatment for abdominal spasms and cramping and received a prescription for LavBid. (R. 519). Claimant returned for treatment on August 19, 1997, at which time Dr. Ettner reported that claimant's blood pressure was stable (132/90) and that claimant was taking Norvasc, Prinivil, HCTZ, Prevacid, and Quinine. (R. 520). Dr. Ettner also ordered claimant to undergo several gastrointestinal tests due to his continued abdominal pain. (R. 520, 523-30). A CT of claimant's abdomen and pelvis conducted on September 8, 1997 revealed a normal abdomen, but showed a lipoma in the right abdominal wall between the internal and external oblique muscles. (R. 526). A colonoscopy with hot biopsy, also conducted on September 8, 1997, revealed a 2 mm sessile polyp in claimant's sigmoid colon. (R. 530). The endoscopist recommended that Dr. Ettner await the biopsy results (for the sessile polyp) and, if it revealed adenoma, repeat the colonoscopy in three years. (*Id.*) Dr. Ettner's records for 1997 indicate that claimant began taking Closoquine for abdominal cramping,

that his dosages for Norvasc and Prinivil changed, and that LavBid was added to his medication regimen. (R. 516-17, 519).

On April 20, 1998, claimant returned to Dr. Ettner and reported that his abdominal cramping episodes were lasting forty-five minutes to an hour in duration, he was bruising easily, and experiencing muscle and joint pain. (R. 521). Dr. Ettner noted that claimant's depression showed no change and he was still experiencing marital problems, and prescribed Zoloft. (*Id.*) Dr. Ettner concluded that claimant's chronic hypertension was "stable on Rx's," and indicated claimant was taking Prevacid, HCTZ, Prinivil, Norvasc, Quinine, and L-Tryptophan. (*Id.*)

Claimant returned to Dr. Ettner for follow up treatment and medical review on September 4, 1999. (R. 522). Ervin complained of "postural hypotension," lethargy, decreased appetite, and diminished libido. (*Id.*) During that visit, claimant's blood pressure first measured 136/100 and then 130/102. (*Id.*) Dr. Ettner discussed lowering claimant's medication and ordered Ervin to monitor his blood pressure at home. (*Id.*) Also in 1999, Dr. Ettner treated claimant for knee pain. (R. 522, 755).

According to the medical records, claimant visited Dr. Ettner four times in 2000. (R. 757, 763). On January 20, 2000, Ervin complained of "postural hypotension" and reported that his self-taken blood pressure readings ranged between 126/80 and 108/70. (R. 757). Claimant returned to Dr. Ettner on March 8, 2000, at which time his blood pressure was 130/98. (*Id.*)

In April 2000, Dr. Ettner referred claimant to Dr. Ronald Silver for treatment of his bilateral distal biceps ruptures. (R. 758-59). Ervin complained of achiness and weakness due to the biceps tears, stating that he had "only a fraction of [his] previous

11

arm strength and [was] constantly experiencing pain." (R. 758). Upon physical examination, Dr. Silver found claimant had a full range of motion of his elbow, and exhibited weakness of supination but strong flexion. (R. 759). Dr. Silver concluded that there was no surgical remedy available and recommended physical therapy and exercise. (*Id.*)

In November 2002, after the close of plaintiff's alleged disability, Dr. Ettner completed a Mental Impairment Questionnaire. (R. 804-13). The questionnaire was limited to the period of December 1993 through April 2000. (R. 804). Dr. Ettner reported that claimant exhibited the following symptoms: appetite disturbance, weight change, decreased energy, disorientation, generalized persistent anxiety, difficulty in concentration, change in personality, psychological or behavioral abnormalities related to an abnormal mental state, motor tension, unrealistic interpretation of physical signs or sensations that one has a serious disease or injury, easy distractibility, memory impairment, sleep disturbance, and a decreased need for sleep. (R. 804-805). With regard to clamant's mental abilities and aptitudes needed to perform unskilled, semiskilled, and skilled work, Dr. Ettner concluded that claimant had the ability to adhere to basic standards of cleanliness and be aware of normal hazards. (R. 805-06). Dr. Ettner classified all other aptitudes and abilities as "unable to meet competitive standards" or "having no useful ability to function." (*Id.*) Dr. Ettner opined that claimant showed "marked" restriction in his daily activities, "marked" difficulties in maintaining social functioning, and "marked" deficiencies of concentration, persistence, or pace. (R. 807). Dr. Ettner also noted "four or more" repeated episodes of decompensation within a twelve month period, each at least two weeks in duration. (*Id.)* Dr. Ettner noted that

claimant exhibited a "[c]omplete inability to function independently outside the area of one's home." (*Id.*) Finally, Dr. Ettner opined that claimant's impairments could cause him to be absent from work for more than four days per month, and that claimant's condition lasted more than twelve months. (R. 808).

Dr. Ettner also completed a Physical Residual Functional Capacity ("RFC") Questionnaire in November 2002, diagnosing claimant with labile hypertension, anxiety, elevated liver function, abdominal spasms, and bilateral biceps tendons rupture. (R. 809-13). In the RFC, Dr. Ettner noted that the attempts to control claimant's hypertension led to depression, diminished cognitive ability, fatigue, and bouts of severe abdominal cramping, frequently giving rise to syncope episodes. (R. 809). According to Dr. Ettner, these symptoms and limitations lasted over twelve months and emotional factors contributed to their severity. (R. 809-10). Dr. Ettner stated that claimant is "stress incontinent and incapable of functioning in any stressful environment." (R. 810). He found claimant's impairments "frequently" interfered with the attention and concentration needed to perform even simple work tasks and that claimant was incapable of even low stress work. (*Id.*) Dr. Ettner found that claimant could sit for only thirty minutes before needing to get up, could stand for only twenty minutes before needing to sit down or walk around, and could sit or stand/walk for about two hours in a typical eight hour work day. (R. 811). Dr. Ettner stated that claimant could occasionally lift up to ten pounds, could rarely lift twenty pounds, and could never lift fifty pounds. (R. 812). Dr. Ettner also reported that claimant could occasionally twist and climb stairs, but could never stoop, crouch, squat, or climb ladders. (*Id.*) Dr. Ettner opined that claimant

was likely to be absent from work more than four times each month due to his impairments.  (R. 813).

### B.    Dr. Louis R. DiRaimo

Claimant submitted medical records from Dr. DiRaimo from February 1994 through August 1999.  (R. 352-59, 406, 467, 751-54).  According to the records, on February 23, 1994, Dr. DiRaimo diagnosed Ervin with hypertension and anxiety and prescribed Inhibase.  (R. 354, 363).  Claimant returned to Dr. DiRaimo three times in the next seven weeks and reported that he was considering a career change because he "can't handle the pressure cooker," which claimant believed affected his blood pressure. (R. 355).  Ervin reported that he had recently moved from the United States to Canada and "considers this a holiday."  (*Id.*)  Dr. DiRaimo concluded that claimant is suffering from hard times and is "mentally - Totally disabled."  (R. 355-56).  He diagnosed claimant with high blood pressure.  (R. 355).

On April 19, 1994, Dr. DiRaimo noted that claimant's blood pressure was "high" and he was ready to admit he'd given into depression and see a psychiatrist.  (R. 356). Dr. DiRaimo prescribed Zoloft and noted that claimant's blood pressure would improve "if this works."  (R. 356).  During claimant's subsequent visit, on May 10, 1994, Dr. DiRaimo reported claimant's blood pressure at 160/104 and noted "BP - definitely tx required," indicating that claimant's blood pressure definitely required treatment.  (*Id.*)  Dr. DiRaimo later prescribed Visken and Rivotril.  (R. 357).

On July 27, 1994, Dr. DiRaimo prescribed Anafranil for claimant's Obsessive Compulsive Disorder ("OCD") and anxiety.  (R. 357).   During his visit on August 26, 1994, claimant expressed a willingness to stop his medications, but Dr. DiRaimo

14

concluded that claimant "must stay on Visken." (R. 358). The following month, Dr. DiRaimo noted that claimant's blood pressure remained high. (*Id.*) He prescribed Hydrolozig and ordered claimant to hold off on other medications. (*Id.*) On October 20, 1994, claimant reported abdominal cramping (R. 358-59) and on November 18, 1994, Dr. DiRaimo started claimant on a tranquilizer. (R. 359). On December 8, 1994, Dr. DiRaimo noted that claimant's blood pressure was "197/120!!" and that he was "always tired etc., NOT happily married." (*Id.*)

In a related medical record, dated December 27, 1994, Dr. DiRaimo reported that he had treated Ervin approximately every three weeks since February 23, 1994, and his diagnosis included: (1) stress-related anxiety; (2) underlying depression; and (3) malignant hypertension. (R. 352). Dr. DiRaimo noted that he unsuccessfully attempted to control claimant's high blood pressure with a number of medications and initiated Methyldopa. (R. 359). Dr. DiRaimo further noted that claimant stopped taking the medications prescribed by his psychiatrist due to the side effects. (*Id.)* Finally, Dr. DiRaimo stated that claimant "is unable to work as he has poor concentration, is forgetful, as well [a]s suffering with insomnia and somatic symptoms. Prognosis is fair." (R. 352). On September 6, 1995, Dr. DiRaimo again opined that claimant was unable to work, specifically that Ervin "is unable to return to his occupation in his present emotional state even though he can do the physical requirements of that job." (R. 406).

On February 13, 1996, Dr. DiRaimo requested assistance from Dr. Hugh Bennett, a physician in Youngstown, Ohio. (R. 418). In connection with that request, Dr. DiRaimo stated that claimant "has been under my care since February 94 at which point he was under medical disability due to the exacerbation of hypertension associated with stress

15

and demands of his former occupation as a chemical engineer." (*Id.*)  Dr. DiRaimo stated he had tried several medications to reduce claimant's blood pressure, but to no avail.  (*Id.*)  He noted that Ervin has been treated with an "aggressive schedule of anti-hypertensive and anti-anxiety agents only to suffer severe side effects that warranted the discontinuance of this regime," and opined that this "may be partially due to the remote possibility of porphyria." (*Id.*)   Dr. DiRaimo relayed that Ervin suffers from an inability to absorb medication in an even-time based manner and requested Dr. Bennett treat claimant "so he may obtain the required medication, Catapress-TTS 2mg/day which is unavailable in Canada." (*Id.*)  Dr. DiRaimo further stated that claimant had injured his right arm in August 1995 and had been referred to several specialists with no apparent satisfactory resolution.  (*Id.*)  He asked Dr. Bennett to assess claimant's right biceps.  (*Id.*)

On March 17, 1997, Dr. DiRaimo requested assistance from Dr. Ettner.  (R. 458). In connection with that request, Dr. DiRaimo stated that claimant informed him of Dr. Ettner's findings regarding his liver ultrasound which "proved a point of concern." (*Id.*) Dr. DiRaimo also stated:

> I have also recommended to Mr. Ervin that he discontinue his employment as it appears that he is under a great deal of stress related to the demands of the job, working apart from his family for extended periods of time and the pain of work sustained injuries to his arms.  These points, when taken in consideration with his medical history of hypertension, depression, insomnia and "abdominal pains" of unknown etiology do not present a healthy prognosis.

(R. 458).

## C.    Dr. Wayne Quan

From June 1994 through May 1998, claimant intermittently sought treatment from Dr. Quan, a certified psychiatrist. (R. 465-77). In response to a request for information from claimant's attorney, Dr. Quan stated that claimant had adjustment disorder and a number of significant health problems of a physical nature, including abdominal pains. (R. 465). Dr. Quan also completed a psychiatric report in which he diagnosed adjustment disorder, recommended supportive treatment, and noted no evidence of memory impairment. (R. 428).

### D. Documentation Submitted to Monarch Life Insurance Company

From March 1994 through January 2001, claimant's physicians completed monthly Progress Reports for Monarch detailing Ervin's physical and mental condition. (R. 575-772). These Progress Reports consistently documented diagnoses of anxiety and moderate to severe hypertension. (R. 575-750; 756, 764, 770). Additional records submitted in connection with Ervin's disability claim reflect that claimant suffered from abdominal pains (R. 457, 669, 677), depression (R. 577, 581, 677) and elevated liver enzymes. (R. 457, 659).

Dr. Ettner completed a Disability Claim Form in which he diagnosed "liver dysfunction, unstable hypertension" and noted that Ervin "must avoid stress," can only lift and carry up to ten pounds, and should never bend or stoop. (R. 457). He also reported that Ervin was hospitalized on May 22, 1997 for chest and abdominal pain. (*Id.*) Dr. Ettner stated that the duration of the planned course of treatment was greater than twelve months and that he could not determine when claimant could return to work. (*Id.*)

Dr. Quan submitted a report to Monarch on June 13, 1994. (R. 459-61). In response to specific queries from Monarch, Dr. Quan diagnosed claimant with Axis I

17

adjustment disorder with mixed emotions features, Axis III hypertension, Axis V impairment in social and occupational functioning, and an illegible Axis IV impairment relating to claimant's occupational functioning.  (R. 460).

In a letter to Monarch dated June 27, 1994, Dr. DiRaimo stated that claimant "is suffering mentally from the stressors of his occupation ... [and] is unable to return to work at present because he is incapable to meet the demands of his occupation."  (R. 512). Dr. DiRaimo later opined, in both 1995 and 1996, that claimant was totally disabled and could not perform his current occupation or any other job, and recommended that he change his career to one that involves minimal stress.  (R. 611, 623, 631, 637).   In June 1994 Monarch requested that Dr. DiRaimo classify claimant's mental / nervous impairment on a scale of one to five.  (R. 585).  Dr. DiRaimo characterized claimant as Class 5, defined as a "significant loss of psychological physiological, personal, and social adjustment (severe limitation)."  (*Id.*)  Dr. DiRaimo also stated the claimant must "change [his] career to less stress situation" and "could work elsewhere in 3 to 6 months." (R. 584).

On October 20, 1994, Dr. DiRaimo again characterized claimant's impairment as a Class 5.  (R. 595).  At that time, he stated that claimant could not work even if his job was modified.  (*Id.*)  By November 22, 1995, Dr. DiRaimo characterized the impairment as "Class 4- Patient is unable to engage in stressful situations or engage in interpersonal relations (marked limitation)."  (R. 624).   Dr. DiRaimo continued to classify claimant's mental / nervous impairment as a Class 4 through July 24, 2000.  (R. 595, 612, 632, 638, 703, 709, 721, 733, 750, 756, 764).   Further, Dr. DiRaimo diagnosed OCD on July 27, 1994 (R. 587), and again on August 26th and September 22nd, 1994.  (R. 589, 591).

18

### E.    Medical Evidence Submitted to the New York State Office of Disability Determinations

Claimant also introduced medical evidence previously submitted to the New York State Office of Disability Determinations, including forms completed by Drs. DiRaimo and Quan and Lucille K. Katzman, Ph.D in 1995.  (R. 360-79, 381-84).  On March 8, 1995, Dr. DiRaimo diagnosed claimant with malignant hypertension and anxiety disorder.  (R. 360).  Dr. DiRaimo stated that claimant's blood pressure remained high until claimant was last seen in February 1995.  (R. 363).  He described claimant as obsessive, depressed, very anxious, forgetful, and having poor attention.  (R. 364).  On May 15, 1995, Dr. Quan stated that Ervin suffered no physical limitations in lifting, carrying, standing, walking, sitting, pushing, or pulling.  (R. 376-77).  He further reported no limitations in claimant's ability to undertake the following work related mental activities: understand, remember, sustain concentration and persistence, socially interact, or adapt in a work environment.  (R. 377-78).[1]

On May 29, 1995, Dr. Katzman reported the results of a Psychiatric-Organicity evaluation authorized by the New York State Office of Disability Determinations.  (R. 381-84).  Results showed that claimant had superior skills in verbal information, arithmetic and vocabulary.  (R. 383).  However, claimant's response to copying a simple code in rapid fashion stood out as a "defect."  (*Id.*)  Dr. Katzman noted that claimant's

---

[1]However, in a letter to Monarch dated November 27, 1995 (six months after the report), Dr. Quan stated that claimant experienced a number of health problems, including uncontrollable hypertension, abdominal pains that may be symptomatic of porphyria, a torn biceps muscle and psychological problems.  (R. 469).  Dr. Quan opined that it was highly unlikely that claimant would be able to "re-engage in the occupation [chemical engineering] that he had performed while he was in the United States."  (*Id.*)

memory for designs was poor for an individual of his general intelligence and that claimant is so aware of his poor memory that he seemed to set himself up for failure. (*Id.*)  Dr. Katzman concluded that Ervin was "under a great deal of stress-related anxiety and perhaps depression together with high blood pressure which has not fully responded to a variety of medications."  (R. 384).  However, Dr. Katzman could not rule out a neurological defect and therefore recommended claimant see a neurologist.  (*Id.*) Finally, Dr. Katzman diagnosed Ervin with Axis I: 300.40 Dysthymic Disorder (Depressive Neurosis).  (*Id.*)

### F.  Claimant's Psychiatric Reviews, Mental RFC's, and Other Evidence Regarding his Alleged Mental Impairment

In addition to Dr. Ettner's completion of the RFC and Mental Impairment Questionnaire discussed above, claimant underwent psychiatric reviews in 1995 and 1996 (R. 385-93, 430-38) and received treatment from Dr. Sam Krane, a psychiatrist. (R. 751-53).

The first psychiatric review, dated June 13, 1995, recommended an RFC Assessment due to the presence of a severe impairment which did not meet or equal a listed impairment.  (R. 385).  The reviewer further noted no evidence of anxiety-related disorders.  (R. 389).  Also on June 13, 1995, and in connection with the initial review of his application for disability benefits, claimant underwent a Mental RFC Assessment.  (R. 394-97).  That RFC assessment noted no significant limitation in understanding, memory, sustaining concentration or persistence, and social interaction and adaptation, but provided no remarks or explanation of the reviewer's conclusions.  (R. 394-96).  A second undated Mental RFC Assessment reported that claimant was no more than

moderately limited in all categories relating to understanding and memory, sustained

concentration and persistence, and social interaction and adaptation.  (R. 833-34).

On August 29, 1996, an unidentified individual conducted a psychiatric review.

(R. 430-38).  This reviewer concluded that Ervin suffered from 12.04 Affective Disorders,

evidenced by a depressed mood or dysthymic disorder, but that the impairment was not

severe.  (R. 430).  The reviewer further noted that claimant showed no degree of

limitation in any of his activities.  (R. 437).

In 1999, Dr. DiRaimo referred claimant to Dr. Krane, who saw claimant on five

occasions.  (R. 751-53).  Dr. Krane provided an assessment to Dr. DiRaimo on June 25,

1999.  (R. 751).  According to Dr. Krane, claimant denied prolonged depression, but

requested assistance with stress management techniques to help him deal with his

financial woes, a child custody matter, and ongoing hypertension.  (*Id.*)  He diagnosed

claimant with Axis I sexual dysfunction, Axis II narcissistic personality disorder, and Axis

III hypertension.  (R. 752).  Dr. Krane opined that claimant was biologically predisposed

to mental illness due to his medication regimen, which could cause psychological side

effects.  (*Id.*)

### G.  Additional Residual Physical Functional Capacity Assessment

Claimant's medical documentation also includes a RFC Assessment dated June

22, 1995.  (R. 398-405).   This RFC reports a primary diagnosis of dysthymic disorder

and a secondary diagnosis of malignant hypertension.  (R. 398).  The unidentifiable

medical consultant noted that claimant could occasionally lift or carry up to fifty pounds,

but could only frequently lift or carry up to twenty-five pounds.  (R. 399).  The medical

consultant  further found claimant could stand, walk, and sit for a total of approximately

21

six hours in an eight hour workday and showed no limitation in pushing or pulling. (*Ia.*)

Finally, the medical consultant made note of claimant's varying blood pressure,

characterized as "difficult to control per MD," as well as claimant's gastrointestinal

problems and anxiety. (*Ia.*)

### H. Additional Medical Records Regarding Claimant's Alleged Physical Impairment

In a letter dated September 21, 1995, Dr. Frans H.H. Leenen with the University

of Ottawa Heart Institute reported that claimant's cardiovascular evaluation and echo

appeared normal. (R. 409-10). He noted that claimant demonstrated a long-standing

battle with hypertension which became increasingly harder to control in recent years. (R.

407-08, 410). Dr. Leenen noted that Ervin's average daytime blood pressure was

135/93, and his average nighttime blood pressure was 139/89. (R. 410). Also in

September 1995, Ervin underwent a cardiac ultrasound and an electroencephalogram,

both showing normal results. (R. 411, 513-14).

In a report dated October 4, 1995, Dr. J. Bormanis assessed Ervin's possible

porphyria and concluded that if Ervin suffered from porphyria, it would be the acute

intermittent type. (R. 423). Dr. Bormanis noted that it is "also possible that he just has

essential hypertension and irritable bowl syndrome." (*Id.*)

On December 19, 1995, Dr. M.J. Duncan provided Dr. DiRaimo with his opinion

regarding claimant's right arm. (R. 422). Dr. Duncan diagnosed a probable biceps

tendon injury and recommended claimant return to see his original orthopedic surgeon.

(*Id.*) On January 10, 1996, claimant saw Dr. Kevin M. Rumball for follow-up treatment

regarding a tear of his right biceps tendon. (R. 421). Dr. Rumball recommended against

surgery, instead suggesting other options, including therapy. (*Id.*) A March 8, 1996 report from the Cleveland Clinic states that Ervin was unable to work for ten days because of a biceps tear in his right arm. (R. 425). The report requests that claimant's activities at work be modified to accommodate his surgery and associated discomfort. (R. 426). There is no record confirming this surgery.

A treatment summary included in claimant's medical records states he visited the emergency room on two separate occasions in 1997 for chest and abdominal pain. (R. 855.) Lab records reflect that, in 1997, Ervin underwent several laboratory tests, including an abdominal sonogram, a colonoscopy, a gastrointestinal examination of the small bowel, and a CT scan, in order to further investigate his abdominal pains. (R. 451-54). The results of these tests included: a hemangioma on the left lobe of the liver, a sessile polyp in the sigmoid colon with a normal biopsy result, a small hiatal hernia with mild reflux, and a lipoma (benign tumor composed of mature fat cells) in the right abdominal wall. (R. 454).

## I.    Other Opinion Evidence

Claimant introduced the opinions of his family members and a co-worker to support his alleged disability.   Allen M. Peskin, a former co-worker of claimant's, executed an affidavit on September 16, 2002 stating that he worked with claimant between 1995 and 1997 and was aware of his medical problems. (R. 772). Mr. Peskin averred that these medical problems caused claimant to disappear regularly, sometimes several times a day and more frequently on days when he was not feeling as well. (*Id.*) Mr. Peskin also stated that he knew Ervin was taking various medications and would not eat much during the day. (*Id.*) Finally, Mr. Peskin averred that Ervin's medical condition

prevented him from being able to perform his work duties during normal business hours because it caused him to be away from his desk for extended periods of time on a regular basis.  (*Id.*)

Gwendolyn M. Barlow, claimant's wife, submitted a letter on claimant's behalf on December 27, 2002.  (R. 802-803).  Ms. Barlow stated that she had known Ervin for over twenty years and has been married to him for the past three years.  (R. 802).   According to the letter, in 1996 Ms. Barlow noticed that Ervin experienced intense abdominal pain lasting over five minutes, and the episodes appeared to grow more severe as time went on.  (*Id.*)  Ms. Barlow stated that claimant's abdominal episodes grew more frequent and intense after August 1999.  (*Id.*)  At one point, the episodes were lasting twenty to thirty minutes and would cause claimant to scream out loud.  (*Id.*)  Ms. Barlow noted that she could actually observe claimant's stomach muscles cramping, followed by noticeable bruising in the area.  (R. 802).  According to Ms. Barlow, the frequency of claimant's abdominal episodes decreased in 2000.  (*Id.*)  However, their intensity grew worse, with pain radiating to claimant's groin and leg.  (*Id.*)  She stated that they searched for medical explanations to no avail, and treatments for the pain were unsuccessful.  (*Id.*)  As of the date of her letter, the episodes appeared less frequently but were more intense.  (R. 803).  Additionally, Ms. Barlow noted that Ervin had difficulty sleeping more than one or two hours at a time and sometimes only slept for a total of four or five hours in a night.  (*Id.*)

Finally, claimant submitted a Third Party Disability Claim Questionnaire, dated March 31, 1995, completed by his then brother-in-law, Esmond McIntosh.  (R. 318-19).  Mr. McIntosh stated that it took claimant longer than average to complete a computer

task.  (*Id.*)  He explained that Ervin seemed "ok" when talking, that he paused before stating his response, and made conversations longer than average.  (*Id.*)  Mr. McIntosh also stated that claimant was able to drive by himself.  (*Id.*)

### III.  Medical Expert's Testimony

Mark Oberlander, Psychology Ph.D, testified as the medical expert ("ME Oberlander") at the hearing held on January 15, 2003.  (R.157-212).  Prior to the hearing, ME Oberlander completed a psychiatric review, dated January 15, 2003, which is included in the medical record.  (R. 819-32).  In that review, ME Oberlander assessed claimant's condition from December 1993 through April 2000 based on 12.04 affective disorders and 12.06 anxiety-related disorders.  (R. 819).  The review characterized claimant's affective disorders as including depressive symptoms characterized by sleep disturbance, decreased energy, and difficulty concentrating.  (R. 822).  With regard to claimant's anxiety-related disorders, ME Oberlander concluded claimant suffered from generalized persistent anxiety accompanied by autonomic hyperactivity.  (R. 824).  He also concluded claimant had functional limitations, specifically a mild restriction of daily activities and moderate difficulties in maintaining social functioning, concentration, persistence, and pace.  (R. 829).  Finally, ME Oberlander found insufficient evidence to establish the presence of "C" criteria for claimant's 12.04 and 12.06 disorders, but failed to explain that conclusion as requested.  (R. 830).

At the hearing, ME Oberlander stated that his testimony was restricted only to issues of psychiatric symptomology and psychiatric involvement.  (R. 163).  Since his expertise is mental impairments, ME Oberlander paid attention "in greater significance" to claimant's physicians whose treatment involved psychiatry or psychology, rather than

25

internal medicine.  (R. 170-71).  ME Oberlander found suggestive evidence of symptomology of affective disorder (listed under 12.04) and anxiety disorder (listed under 12.06).  (R. 163).  ME Oberlander testified that the following indicia of affective disorder were implicated in claimant's medical records: symptoms of dysthymic disorder (depression), sleep disorder, decreased energy, and difficulties concentrating and thinking.  (R. 166).  ME Oberlander found that the record evinced generalized anxiety disorder and autonomic hyperactivity, but there was no evidence of any personality disorder.  (R. 167).  ME Oberlander later stated that no listing is met or equaled.  (R. 174).

While acknowledging that some hypertensive medications result in side effects, such as depression and difficulty in concentration, ME Oberlander initially declined to discuss the issue because he felt that he was not qualified to offer testimony.  (R. 189).  However, ME Oberlander later testified that, given the claimant's frequency of medication change, he would "speculate" that claimant may have been biologically predisposed to psychological side effects.  (R. 191).  ME Oberlander opined that hypertension can impact mental health symptoms, and vice versa.  (R. 197-98).  ME Oberlander classified himself as an "expert on the interaction between psychological issues and physiological, stress related, disorders."  (R. 198).  With regard to claimant's specific condition, ME Oberlander concluded that "Social Security listing categories 12.04 and 12.06 are secondary to some of the underlying medical issues that [claimant] has been struggling with, not primary."  (*Id.*)  However, ME Oberlander declined to comment on whether these medical conditions affect how stressors impact Ervin's ability to work.  (R. 198-99).

ME Oberlander testified that claimant's medical records contain "a wide range of diagnostic speculations and conclusions," including anxiety disorder, depressive disorder, dysthmia, adjustment disorder, OCD, stress, anxiety, and personality disorder. (R. 162). However, ME Oberlander concluded that many of these diagnosis "are based on evidence that [he] did not find in the record." (*Id.*) Specifically, ME Oberlander noted repeated references to anxiety without any specific symptomology (*id.*) and stated that the record lacked sufficient reports in relation to Ervin's psychiatric treatment and use of psychotropic medications. (R. 169). He also testified that it was difficult to discern from the record when claimant's psychotropic medications began or finished, and that there were no medication records from Dr. Quan, who presumably prescribed claimant's psychotropic medication. (R. 193-94). ME Oberlander acknowledged that claimant's internists documented his current medications during each office visit. (*Id.*) However, ME Oberlander stated he didn't look at visits to internists in connection with claimant's medication, but instead looked at the psychiatric data. (*Id.*) ME Oberlander further testified that he found frequent changes to claimant's primary diagnosis in the medical records, which he deemed significant. (*Id.*)

 ME Oberlander acknowledged the progress reports completed by Dr. DiRaimo classifying claimant's mental impairment as a class 5. (R. 185). However, ME Oberlander testified that he gave these evaluations less weight because they were completed by an internist, not an expert in psychology, and the evaluation is simply a pre-printed form for an insurance company. (R. 186-87).

ME Oberlander opined that the following functional limitations exist due to Ervin's psychiatric impairments: mild restrictions of daily living and moderate difficulties

27

maintaining social interaction, concentration, and persistence or pace. (R. 168). He found no episodes of decompensation due to psychiatric reasons and concluded no C criteria applied to Ervin's claim. (*Id.*) ME Oberlander also opined that claimant experienced some difficulty with staying on task, especially when multi-tasking. (R. 175-76). He emphasized that these limitations were only applicable to claimant's performance of tasks within his "occupation achievement," and he did not determine if the limitations applied to occupations below claimant's educational and intellectual capacity. (R. 177). ME Oberlander further testified that "by speculation .. with regard to simple work tasks, there would be no functional limitations based on mental health impairments." (R. 178).

## IV. Vocational Experts' Testimony

### A. Testimony of Dr. Susan Entenberg

At the April 21, 1998 hearing, Susan Entenberg, a certified vocational rehabilitation counselor, testified as the vocational expert ("VE Entenberg"). (R. 81-87). VE Entenberg indicated that all of Ervin's past work was very highly skilled and sedentary. (R. 83).

Claimant's attorney presented VE Entenberg with the following hypothetical person: an African-American with labile hypertension who experiences abdominal cramps while at work that are so severe that he has to spend two to four hours in the bathroom each shift. (R. 85). This hypothetical person would also pass out while having these episodes approximately ten to twelve times per week and experience stress, depression, and memory impairment when operating under deadlines at work. (*Id.*)

Based on the attorney's hypothetical, VE Entenberg opined that such a person could not continue his past work as an engineer. (*Id.*) She further opined that these particular problems would preclude any employment because this person could not perform any work activities. (*Id.*)

The attorney then asked VE Entenberg to assume that the same hypothetical individual changed jobs from being a practicing engineer to being an employment consultant who places engineers. (R. 85-86). Based on this second hypothetical, VE Entenberg maintained her position that a person suffering from those symptoms of the hypothetical person could not do any gainful work. (R. 86-87).

### B.    Testimony of Dr. Frank Mendrick

A supplemental hearing was held on February 12, 2003 in order to obtain supplemental testimony from a second vocational expert, Mr. Frank Mendrick ("VE Mendrick").[2] (R. 206, R. 225-62). VE Mendrick classified all of claimant's positions as a chemical engineer as very skilled work involving heavy exertion. (R. 242-43). He described claimant's position with the scholarship organization as semi-skilled and sedentary, requiring no lifting. (R. 242). VE Mendrick classified claimant's job at ACS National as skilled involving light exertion (R. 241), and claimant's work with the Census Bureau as skilled and involving a medium level of lifting and carrying (thirty pounds maximum) and sitting and standing (split equally throughout the day). (R. 240). Finally,

---

[2]VE Entenberg was excused from testifying because she was under contract with both the claimant and the Social Security Office. (R. 206). While VE Entenberg was not called to testify at the hearings in 2003, her testimony from the hearing in 1998 was still taken under consideration by ALJ Karmgard in the most recent opinion.

VE Mendrick classified claimant's work as a patent agent as skilled and sedentary. (R. 239).

The ALJ provided the following hypothetical to VE Mendrick: a forty-seven year old male with a bachelor's degree in engineering, having the same employment history as Ervin, with the ability to lift up to fifty pounds occasionally and twenty-five pounds frequently and limited sitting and standing and walking - each to a maximum of six hours within an eight hour day. (R. 243). VE Mendrick opined this hypothetical person could perform sedentary to medium work and would be able to perform any of claimant's past jobs, except for lifting in excess of fifty pounds. (R. 244).

The ALJ modified the hypothetical to include the same information with the following additional limitations: the hypothetical individual may not be exposed to hazards such as unprotected heights or dangerous machinery, may not perform overhead work more than occasionally, and may not have the ability to recall, focus upon, carry out complex or detailed instructions, or maintain concentration for complex and detailed tasks. (*Id.*) The hypothetical individual would, however, be able to recall, focus, and carry out simple instructions and perform simple tasks. (*Id.*) Based on this hypothetical, VE Mendrick opined that the hypothetical individual would not be able to do any of the past work carried out by claimant. (R. 245).

The ALJ further added that the hypothetical individual could not perform work requiring more than incidental contact with members of the general public and limited the results to medium and light levels of work. (*Id.*) VE Mendrick opined that the hypothetical individual would be able to do general assembly or factory work, such as bench assembly. (R. 245-46). VE Mendrick testified that there are approximately

30

10,000 unskilled jobs at the light level and 5,000 at the medium level available in the region. (R. 246). VE Mendrick also stated that general inspection jobs would be available, and that there are 4,000 available jobs at the light level and 2,000 at the medium level. (*Id.*)

The ALJ then asked VE Mendrick to assume that the hypothetical individual would not be able to understand, recall, focus, or perform complex or detailed instructions or be able to concentrate for an extended period, but he would have the ability to understand, recall, focus on and carry out simple routine instructions at a sustained workmanlike pace. (R. 246-47). VE Mendrick opined that this would produce the same results as the previous hypothetical. (R. 247). He stated that general factory workers must be able to stay on task or sustain focus without a break in work activity for a "fifty minute hour," allowing ten minute rests for every fifty minutes of constant attention. (*Id.*)

Next, the ALJ asked VE Mendrick to assume that the hypothetical individual is able to concentrate and focus in order to perform simple, routine instructions for simple, routine tasks, but cannot sustain those activities for longer than two hours at a time without a five or ten minute break. (R. 247-48). VE Mendrick explained that the individual should be able to complete factory work jobs, which usually provide a fifteen minute break after two hours, a half hour lunch, and another fifteen minute break two hours after returning from lunch, and would therefore require the individual to sustain focus for 50 minutes of each hour. (R. 248).

The ALJ then asked VE Mendrick to assume the same hypothetical individual, but one that cannot adapt to frequent changes in work settings, work procedures, or work practices, and is not able to independently set work goals or schedule his work activities.

31

(R. 248-49.)  Based on this modification, VE Mendrick opined that this individual could perform general assembly, inspection, general labor work, or work as a material handler supplying parts to co-workers.  (R. 250).  He testified that there were 6,000 material handling jobs at the light level, but no positions at the medium level.  (R. 249-50).  VE Mendrick explained that with factory work, there are usually two to three changes in parts each day, but no changes in work settings.  (R. 249).

The ALJ further provided that the hypothetical individual could carry up to twenty pounds occasionally and ten pounds frequently, and that he could not climb ladders, ropes, or scaffolds, but could climb ramps or stairs, and balance, stoop, kneel, crouch, and crawl occasionally, and could not do overhead work for more than twenty percent of the day.  (R. 251).  Based on this modification, VE Mendrick testified that the light jobs could still be performed, but the medium jobs would be completely eliminated.  (R. 251-52).

The ALJ then limited the hypothetical person to lifting up to ten pounds occasionally, carrying small files or small tools no more than frequently, and standing and walking for up to two hours total in a workday, but only for twenty minutes at a time.  (R. 252).  VE Mendrick testified that these limitations would eliminate the light work, but that this individual could perform some sedentary work in the assembly field.  (*Id.*)  He then testified that there are about 1,200 positions in assembly work and 1,000 in inspection.  (*Id.*)

Next, the ALJ referred VE Mendrick to the limitations outlined by claimant's wife and treating physician, Dr. Ettner.[3]  (R. 255).  Specifically, the ALJ stated that the hypothetical individual does not meet competitive standards for remembering work-like procedures, cannot recall or carry out simple and short instructions, and has no ability to function for two hour segments.  (*Id.*)  VE Mendrick opined that such an individual "would be unable to do any work."  (*Id.*)

The ALJ added that the hypothetical individual was incapable of handling even low stress jobs, he cannot sit for longer than thirty minutes at a time, and cannot stand for longer than twenty minutes at a time.  (R. 255-56).  Additionally, he must be able to take unscheduled breaks, approximately forty-five to sixty minutes in duration, around four times each day. (R. 256).  He would be able to lift up to ten pounds, maneuver his head up, down, left, and right, and hold it in a steady position, and can climb stairs occasionally.  (*Id.*)  The individual can never stoop, crouch, squat, climb ladders, or do overhead work for more than twenty percent of the day, but can use both his hands and do gross and fine manipulation for fifty percent of the workday.  (*Id.*)  Based on this hypothetical, VE Mendrick stated that if the individual has to leave his position for a period of thirty minutes to an hour at least two times a day, skilled, sedentary and unskilled work would not be available.  (R. 256-58).  Essentially, this individual could not perform skilled work unless he were his own boss, having control of his own schedule. (*Id.*)  VE Mendrick opined that it is a "very rare exception" for an employer to provide an

---

[3]The ALJ specifically referenced exhibit 70 (R. 800-13) which includes the letter submitted on claimant's behalf by his wife (and attorney), Gwendolyn Barlow, describing claimant's abdominal spasms and the Mental Impairment Questionnaire and Physical Residual Functional Capacity Questionnaire completed by Dr. Ettner.

employee with the option of making his own schedule, especially from the time he is hired. (R. 259). Finally, VE Mendrick testified that "[a]ny absence from the workstation that exceeds the two breaks and lunch period would be unacceptable behavior... [after an initial reminder] the person would be terminated. So there's no work that person could do as long as that behavior continues." (R. 262).

### C. Letter from Pharmacist Sandy Kline

On January 23, 2003, claimant submitted additional records to be considered in connection with the review of his claim for disability benefits, including a letter and treatment summary from Sandy Kline, a clinical pharmacist ("CP Kline"), opining as to the adverse effects of claimant's prescribed medications. (R. 849-50). CP Kline noted that many of the medications claimant took from 1991 through 1994 were not to be taken at the same time and were known to cause increased liver enzymes, depression, anxiety, restlessness, chest pain, insomnia, and fatigue - symptoms reportedly experienced by Ervin. (R. 852). She stated that many of the medications were prescribed in higher dosages than recommended. (*Id.*) While acknowledging that "no specific drug-drug interactions were identified," CP Kline found it would not "ever be feasibly to conduct such a study." (R. 850). CP Kline concluded in her summary that Ervin endured a "battery of medications" over the years which may have resulted in continued labile hypertension; severe adverse psychological effects, including sleep disorder, depression, and impaired cognitive abilities; and physical aberrations of syncope, lethargy, cramps, gastrointestinal disturbances, and impaired liver function. (R. 856).

**LEGAL ANALYSIS**

**I.      Standard of Review**

The ALJ's decision must be affirmed if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)).  We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F. 3d 863, 869 (7th Cir. 2000)).  Rather, this Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.*  While the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F. 3d 1171, 1176 (7th Cir. 2001).  The ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**II.     Analysis Under the Social Security Act**

Whether a claimant qualifies to receive disability insurance benefits depends on whether the claimant is "disabled" under the Social Security Act.  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether [he] can perform [his] past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon*, 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski*, 245 F.3d at 885-86.  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

The ALJ followed this five-step analysis.  At step one, the ALJ found that claimant had not engaged in any disqualifying substantial gainful activity, but reserved this issue reasoning that claimant may have been substantially and gainfully employed for certain periods of time.  (R. 29, 44).  At step two, the ALJ found medically determinable impairments of hypertension, possible porphyria, bilateral biceps rupture/tendinitis, depression, anxiety and/or adjustment disorder which amount to a severe impairment.  (R. 30, 44).  Next, at step three, the ALJ determined that claimant's impairments do not

36

meet the requirements or equal the level of severity contemplated for any impairment listed in Appendix 1 to Subpart P, Regulations No. 4. (*Id.*) The ALJ also found that the claimant had the physical and mental RFC to perform and sustain a limited range of light work. (R. 44). At step four, the ALJ determined that claimant could not perform his past work as a chemical engineer. (*Id.*) Finally, at step five, the ALJ found that there were a significant number of jobs in the national economy that claimant could perform. (*Id.*) Claimant argues that the ALJ's RFC determination is not supported by substantial evidence. Specifically, he claims the ALJ did not accord proper weight to the opinions of claimant's treating physicians and ignored evidence relating to the side effects of claimant's medication. Ervin also contends that the ALJ did not provide a rationale for his conclusion that claimant's allegations of his inability to work were not credible and erred at step five by acknowledging the vocational expert's opinion but then discounting his conclusion without comment.

### A.     The ALJ's RFC Determination Is Not Supported by Substantial Evidence

A claimant's RFC is defined as "the most [the claimant] can do" in light of the alleged impairment and any related symptoms, including pain which "may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. 404.1545(a). In determining a claimant's RFC, the ALJ must consider all of the medically determinable impairments, including those which are not severe. 20 C.F.R. 404.1545(b). The RFC determination must be "based on all of the relevant medical and other evidence." 20 C.F.R. 404.1545(c). This function-by-function analysis of a claimant's functional limitations must be performed before an ALJ can express a

claimant's RFC in terms of the exertional levels of work, such as sedentary, light or medium.  SSR 96-8p.

ALJ Karmgard found that claimant has the RFC to perform and sustain a limited range of light work.  (R. 44).  Specifically, the ALJ found that, as a result of his medically determinable impairments, claimant cannot: lift or carry more than twenty pounds occasionally and ten pounds frequently; sit, stand, or walk with normal breaks for more than six hours each in an eight hour day; climb ladders, ropes or scaffolds, climb ramps or stairs, balance, stoop, kneel, crouch, or crawl no more than occasionally.  (R. 30). The ALJ further found claimant may not perform overhead work for more than twenty percent of the day and must avoid unprotected heights or dangerous machinery.  (R. 30). With regard to claimant's mental capacity, the ALJ found claimant cannot understand, recall, focus upon, or carry out complex or detailed instructions, and cannot maintain concentration as is required to perform complicated tasks at a sustained workman-like pace.  (*Id.*)  However, the ALJ found the claimant is able to understand, recall, focus upon, or carry out simple, routine instructions and perform simple routine tasks at a workmanlike pace, and further found claimant may sustain such required attention, concentration and focus for continuous performance for two hours followed by a five to ten minute break.  (*Id.*)  Finally, the ALJ found claimant cannot endure more than incidental contact with the general public and cannot work in positions that involve frequent changes in work settings or procedures or that require claimant to independently set goals or schedules.  (*Id.*)

### 1. The ALJ Failed to Explain the Weight Given to Various Medical Opinions in the Record

38

Under the applicable regulations, the ALJ is required to explain the weight given to the opinions of Ervin's treating physicians.  20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.")  Generally, the opinions of a treating physician who is familiar with the claimant's impairments, treatments and response should be given greater weight in disability determinations.  *Id*; *see also Clifford*, 227 F.3d at 870 ("more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances.")  If the ALJ does not give the opinions of claimant's treating physicians controlling weight, he is required to explain the weight given to the opinions of the medical examiner, consultant or other program physicians. 20 C.F.R. §404.1527(f)(2)(ii).

It appears that ALJ Karmgard relied on ME Oberlander's opinion in determining the claimant's RFC.  (R. 30, 42-3).  However, ME Oberlander's testimony was restricted to issues of "psychiatric ... symptomology and psychiatric involvement."  (R. 163).  ME Oberlander testified that his "area of expertise is mental impairments" and, in reviewing claimant's medical records, he paid attention "much more - and in great significance to those providers whose expertise is in psychiatry or psychology rather than in internal medicine."  (R. 170-71).  Similarly, the psychiatric review and RFC assessment ME Oberlander prepared (R. 819-32) were limited to claimant's alleged mental impairment, specifically 12.04 affective disorders and 12.06 anxiety-related disorders.  (R. 819).

ALJ Karmgard accepted ME Oberlander's opinion that no mental impairment listing had been met or equaled and claimant's mental limitations were "secondary to stress and elements of preoccupation with concerns over disability." (R. 42).  We do not

hold that there was an insufficient basis for the ALJ to accept ME Oberlander's opinion regarding claimant's mental limitations. Rather, we remand this case because the ALJ did not explain the weight given to the opinions of claimant's psychiatrists, Drs. Krane and Quan, and for the other reasons discussed below. *See* 20 C.F.R. §404.1527(e)(2) (obligating the ALJ to use medical sources, including treating sources, to provide evidence on the nature and severity of an impairment); *Clifford,* 227 F.3d at 870 ("an ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability .... failure to do so constitutes error ") (internal quotations omitted).

On remand, the ALJ must also clarify the weight given to the opinions of Drs. DiRaimo and Ettner under the analysis mandated by 20 C.F.R. § 404.1527(d)(2). Dr. DiRaimo diagnosed claimant with high blood pressure requiring treatment. (R. 356, 359). According to the medical documentation, Dr. DiRaimo's attempts to control Ervin's malignant hypertension were unsuccessful (R. 352, 359) and he concluded that the "aggressive" treatment schedule resulted in "severe side effects that warranted the discontinuance" of claimant's medication regime. (R. 418). Dr. Ettner diagnosed claimant with severe, uncontrollable hypertension (R. 333, 809-13) and related depression, diminished cognitive ability, fatigue, and bouts of severe abdominal cramping, frequently giving rise to syncope episodes. (R. 809). He concluded that, as a result of these severe impairments, claimant could not function independently outside of his home. (R. 807).

ALJ Karmgard failed to identify the weight given to these opinions. This Court cannot determine what evidence the ALJ relied on in concluding that Ervin's physical impairments were not conclusively disabling. *See* 20 C.F.R. §404.1527 (d),(e)(2). ME

Oberlander did not testify regarding claimant's physical limitations. ME Oberlander stated that he was not qualified to testify as to possible side effects from claimant's hypertensive medications (R. 189), and could merely "speculate" that claimant may have been biologically predisposed to psychological side effects. (R. 191). ALJ Karmgard did review Ervin's medical history.[4] However, the ALJ failed to cite specific medical evidence or explain why he gave less weight to claimant's treating physicians' diagnosis of hypertension, abdominal cramping and related severe side effects when making his RFC determination.[5] On remand, the ALJ must remedy this error. *See* 20 C.F.R. §404.1527(d),(e); *Clifford*, 227 F.3d at 870 (an ALJ "must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.")

### 2. The ALJ Failed to Consider the Relationship between Claimant's Medication and his Medical Impairments

The ALJ also failed to consider evidence demonstrating that claimant suffered from side effects of his medication regime. "The side effects of medications can have a significant impact on an individual's ability to work and therefore, should figure in the disability process." *Varney v. Secretary of Health & Human Servs.*, 846 F.2d 581, 585 (9th Cir. 1988)(*rev'd* 859 F.2d 1396 (9th Cir. 1998)); *see, also Porch v. Chater*, 115 F.3d

---

[4]In reviewing Ervin's subjective complaints and the supporting medical documentation, the ALJ made a number of factual errors. For example, ALJ Karmgard concluded that claimant's blood pressure was less than 100 (diastolic) in November 1994 when medical records indicate it was greater than 100 and ignored Dr. DiRaimo's diagnosis that claimant needed treatment for his blood pressure. (R. 33).

[5]ALJ Karmgard did cite specific medical evidence to support his conclusion that claimant's biceps tear was not severe. (R. 35).

567 (8th Cir. 1997). ALJ Karmgard concluded that the medical record contains no specific evidence of deficiencies in mental function associated with "certain medication" and "no evidence of any direct correlation between dosage changes and specific symptomology." (R. 43). However, claimant introduced medical records from Dr. Krane opining that claimant was biologically predisposed to mental illness due to his medication regimen which could cause psychological side effects. (R. 752). While the ALJ noted that claimant underwent a psychiatric evaluation by Dr. Krane, he failed to recognize Dr. Krane's conclusion regarding the effect of claimant's medication. Similarly, the ALJ referenced Dr. DiRaimo's finding of "unidentified side effects from anti-anxiety medication," (R. 35) but failed to consider the side effects. The ALJ also ignored the testimony of ME Oberlander who, when asked if any of claimant's symptomology is associated with medication side effects, stated "[g]iven the [c]laimant's testimony today as to the frequency of medication change, I would speculate that that may have been the case." (R. 191). The ALJ must evaluate this evidence. 20 C.F.R. §404.1527(d).

Claimant also provided a report by CP Kline opining as to the adverse effects of his prescription medications. (R. 849-50). CP Kline opined that many of the medications claimant took from 1991 through 1994 were known to cause a number of the symptoms he reported, including depression, anxiety, increased liver enzymes, chest pain, insomnia and fatigue. (R. 852). ALJ Karmgard dismissed CP Kline's opinion for failing to provide information "regarding the nature, frequency or duration of symptomology, or regarding the degree of limitations arising out of the same." (R. 39). Because CP Kline provided a summary of claimant's treatment, including his specific complaints and symptomology, the date and dosage of various medications and related side-effects (R.

42

851-57), the ALJ's conclusion was in error. On remand, the ALJ should consider the treatment summary as well as other evidence regarding the side effects of claimant's medication.

**B.      The ALJ's Credibility Determination is "Patently Wrong"**

Ervin also contends that the ALJ erred in rejecting his credibility, as well as the credibility of his wife and coworker who provided statements regarding claimant's alleged disability. To succeed on this ground, Ervin must overcome the high level of deference that is afforded to an ALJ's credibility determination. *Powers v. Apfel*, 207 F. 3d 431, 435 (7th Cir. 2000) (holding that the credibility determinations of hearing officers are afforded special deference). Because the ALJ is in the best position to evaluate the credibility of a witness, we will reverse an ALJ's credibility determination only if a claimant can show that it was "patently wrong." *Id.* However, in evaluating the credibility of statement supporting a Social Security application, an ALJ must comply with the requirements of Social Security Ruling 96-7p, including the requirement that the ALJ articulate the reasons behind his credibility finding. *Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003).

Here, the ALJ states that the claimant is not entirely credible "for the reasons set forth in the body of this decision." (R. 44). This finding is conclusory and fails to comply with SSR 96-7p. Under SSR 96-7p, it is not satisfactory to "make a conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible." SSR 96-7p at 4 (internal quotations omitted); *see also Banks v. Barnhart*, 63 Fed. Appx. 929, 932 (7th Cir. 2003) (mandating reversal when the ALJ does not explain his credibility determination). Because the ALJ never set forth the

reasons for his credibility finding in the body of the opinion, remand is appropriate. *Brindisi*, 315 F.3d at 788.

Furthermore, the ALJ must consider the credibility of the claimant in light of the "entire case record, including the objective medical evidence, the individual's own statement about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p; *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). Here, the ALJ failed to consider portions of the case record supporting claimant's testimony. For example, the ALJ did not consider the fact that the medical evidence and claimant's testimony consistently discussed recurring abdominal pains. The ALJ also neglected to address the numerous medications taken by claimant, the symptoms coinciding with these medications and the side effects of claimant's medications as identified by Dr. DiRaimo, Dr. Krane and CP Kline. (R. 118, 418, 751, 849-50). Moreover, the ALJ should have considered claimant's treatment history, including claimant's numerous medications and medication changes. According to SSR 96-7p, constant attempts to obtain successful treatment serve as a strong indicator that a claimant's statements regarding his symptoms and pain are credible. SSR 96-7p. Moreover, constant changes in medications, varying forms of treatment in order to find one without side effects, and referrals to specialists generally weigh in favor of claimant's credibility. SSR 96-7p. In this case, Ervin's medication regimen was ever-changing, he consistently complained of side effects, and he was referred to Dr. Quan and others to aid in treating all of his symptoms. (R. 118, 418, 437, 758-59, 765).

In determining credibility, the ALJ should also consider consistency, specifically the claimant's consistency in his own statements, the consistency between the claimant's statements and medical and/or laboratory finding and the consistency of the claimant's statements with reports and observations by other people. SSR 96-7p. Here, Ervin's own statements were consistent throughout the record and during his testimonies at all three hearings. His statements are also overwhelmingly consistent with his treating physicians' reports and are supported by letters submitted by his wife and former co-worker. (R. 772, 802-03). Nevertheless, the ALJ discounted claimant's credibility because his statements regarding abdominal pain and medication side effects are not supported by objective evidence within the record. (R. 42-3). According to SSR 96-7p, "the absence of objective medical evidence supporting an individual's statements . . . is only *one* factor that the adjudicator must consider in assessing an individual's credibility." SSR 96-7p. Accordingly, just because claimant's abdominal problems, for example, are not supported by laboratory findings does not mean that they must be completely discounted.

For these reasons, this Court finds the ALJ patently erred in his credibility determination of the claimant. On remand, the ALJ should clarify his credibility determination and articulate specific reasons supporting his determination.

C.      The ALJ's Analysis at Step 5

Finally, claimant contends the Commissioner did not meet its burden at step five to establish that claimant could perform work in the national economy. 20 C.F.R. 404.1560(c)(2). In particular, Ervin argues the ALJ failed to adequately explain his conclusion that a significant number of jobs remain that claimant can perform in light of

the testimony by both vocational experts that there are no jobs that someone with claimant's alleged limitations can perform. (R. 45). Claimant's argument is contingent upon the ALJ concluding that Ervin's limitations did, in fact, require him to be away from his work station for four hours in the typical work day. (R. 44, 85, 255-56). Because we have already remanded this case and ordered the ALJ to explain his RFC determination, we do not reach this issue. However, we caution the ALJ that on remand, he must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**CONCLUSION**

For the foregoing reasons, Ervin's motion for summary judgment is granted. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTER:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**DATED: February 21, 2008**